1  Anthony Oliver, Plaintiff Pro Se
2  7306 GA Highway 21, Suite 101 – Box # 187
   Port Wentworth, Georgia 31407
3  (818) 624-2504 (telephone)
   (818) 855-1119 (facsimile)
4

5  *Plaintiff Pro Se*

6
                **UNITED STATES DISTRICT COURT**
7                **CENTRAL DISTRICT OF CALIFORNIA**

8  ANTHONY OLIVER, an individual;        )   Case No. CV17-04735MWF(SSx)
9                                        )
                                         )   COMPLAINT FOR DAMAGES
10             Plaintiffs,               )   AND INJUNCTIVE RELIEF
   vs.                                   )
11                                       )
                                         )   **[DEMAND FOR JURY TRIAL]**
12 Scram of California, Inc., a California )
   Corporation; Alcohol Monitoring       )
13 Systems, Inc., a Delaware Corporation; )
   and DOES 1-10, inclusive.             )
14                                       )
                                         )
15                                       )
                                         )
16             Defendants.               )
                                         )
17                                       )
                                         )
18 _____  )

19

20

21

22

23

24

25 ///

26 ///

27 ///

28            **COMPLAINT FOR DAMAGES**

                          -1-
                   PLAINTIFFS' COMPLAINT FOR DAMAGES

1  Plaintiff Anthony Oliver ("Plaintiff") brings this complaint against the said
2  Defendants Scram of California, Inc. ("SCRAM") and Alcohol Monitoring
3  Systems, Inc. ("AMS") (collectively "Defendants") who purchased Defendants'
4  transdermal alcohol monitoring services, to seek redress from Defendants for their
5  failure to disclose a known defect with their transdermal monitoring device which
6  causes false-positive readings as a result of environmental contaminants unrelated
7  to the said wearer's consumption of any alcohol. The Defendants are aware of, and
8  still aware of this defect in their transdermal monitoring device, yet have done
9  nothing to inform their customers of this potential defect prior to providing them
10 the devices and charging them for the service. Plaintiff seeks damages, restitution
11 and injunctive relief against Defendants for the false advertising of their
12 transdermal monitoring service. For his complaint, the Plaintiff alleges as follows
13 upon personal knowledge as to himself and his own acts and experiences, and as to
14 all other matters, upon information and belief, including investigation conducted
15 by several attorneys.

16  Plaintiff brings this action against the Defendants to challenge the systematic
17 defects in the products that are produced by SCRAM and AMS. At times, when a
18 customer of SCRAM complains about the product causing injury by way of
19 affixing the device to the customer, or about the high exuberant prices deployed by
20 the Defendants, the employees of SCRAM are directed to file with the Court false
21 reading violation reports that would often reflect that the customer, like the said
22 Plaintiff consumed alcohol when in fact they haven't.  This is just one of many
23 dirty tactics that SCRAM uses to reap the secure benefits of stuffing their wallets
24 with billions of dollars all while innocent people, like the Plaintiffs rot away
25 somewhere in a jail cell.

26  One of the major purposes of sentencing is rehabilitation. Yet, when a
27 person in California, like in many other states, is charged with a DUI related case,
28 the Defendant will often be directed by the trial Court to wear a SCRAM ankle

1  bracelet. To the extent that the person is ordered by the Court not to consume any

2  form of alcohol, it substantially occurs more often than not, that a false reading is

3  produced by the Defendant SCRAM and AMS. Some offenders in California, like

4  the Plaintiffs was or is required to wear the SCRAM and AMS device until their

5  criminal case is adjudicated. Coincidentally, when an offender is set to discharge

6  from the SCRAM program, most Defendants, their attorneys, and the Court will

7  receive a violation report just days before discharge. In a money-making scheme,

8  the Defendants SCRAM and AMS work together to generate false reports. At the

9  end of the day, the Defendants, which starts with AMS, then goes to SCRAM, is a

10  report reflecting the wearer consumed alcohol when in fact they haven't.

11  Plaintiff is informed, believes and thereon allege that as a result of this

12  money-making scheme that is circumvented by the Defendants SCRAM and AMS,

13  that each year in every County of the State of California, that thousands of clients

14  of SCRAM are sent back to jail, prison and even having their bond revoked as a

15  result of this money-making scheme. Regardless of whether the client is returned

16  to custody as a result of the false violation report, the clients of SCRAM can suffer

17  other deprivations and consequences and a result of the Defendants false reports.

18  **VENUE AND JURISDICTION**

19  1.    Pursuant to 28 U.S.C. § 1332, this Court has diversity jurisdiction as

20  both the Plaintiff and Defendants are residents of different states. As Plaintiff is a

21  resident of the State of Georgia, Defendant Scram of California, Inc., is a resident

22  of California, and Alcohol Monitoring Systems, Inc., is a resident of Delaware.

23  And the amount in controversy exceeds § $ 75,000 dollars.

24  2.    Additionally, Scram of California, Inc., has a principle place of

25  business is located in this District. Further, the Defendant Alcohol Monitoring

26  Systems, Inc., has a registered agent within this District and both Defendants

27  collect financial monies within this District. Therefore, Defendants SCRAM and

28  AMS have the minimum contacts necessary to fall under the jurisdiction of this

PLAINTIFFS' COMPLAINT FOR DAMAGES

1   Court.

2       3.      The Court's authority to grant declaratory relief and related injunctive

3   relief is based upon 28 U.S.C. §§ 2201-2202 because an actual controversy exists.

4       4.      This Court has personal jurisdiction over Defendants because they

5   conduct operations and/or sales in California, are registered to do business in

6   California, and the acts alleged herein originated in this District.

7       5.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because

8   a substantial part of the events giving rise to the claim occurred in this District.

9                               **THE PARTIES**

10      6.      Plaintiff is a citizen of the State of Georgia

11      7.      Defendant, Alcohol Monitoring Systems, Inc., is a Delaware

12  corporation with its national headquarters located in Littleton Colorado. Defendant

13  AMS is a nationwide provider of alcohol monitoring devices and services to state

14  and federal law enforcement agencies, courts, as well as any and other private

15  entities such as rehabilitation centers. Defendant AMS is registered in California

16  and provides alcohol monitoring services in California, including in this District,

17  and elsewhere throughout the United States.

18      8.      Defendant, Scram of California, Inc. is a California corporation with

19  its national headquarters located in Los Angeles, California. Defendant is a local

20  distributer and provider of AMS's devices and services in this District, and

21  elsewhere throughout California.

22      9.      Plaintiff is currently ignorant of the true name(s) and the capacities,

23  whether individual, corporate, associate, or otherwise, of the Defendants sued

24  herein under the fictious names DOES 1 through 10, inclusive, and therefore, sues

25  such civil Defendants by such fictitious names. Plaintiff will seek leave to amend

26  this Complaint to allege the true names and capacities of said fictitiously named

27  Doe Defendants is legally responsible in some manner for the events and is also

28  sued pursuant to California Code of Civil Procedure 474.

10.   Plaintiff is informed and believes and thereon alleges that the Defendants, including the fictitious Doe Defendants, were at all times acting as actual agents, conspirators, ostensible agents, partners and/or joint ventures and their employees of all other Defendants, and that all acts alleged herein occurred within the course and scope of said agency, employment, partnership, and joint venture, conspiracy, or enterprise, and with the express and/or implied permission, with all such knowledge, consent, authorization and ratification of their co-Defendants however, each of these allegations are deemed "alternative" theories whenever not doing so would result in a contraction with the other allegations.

11.   Whenever the Complaint refers to any act of the Defendants, the allegations shall be deemed to mean the act of those Defendants names in the particular cause of action, and each of them, acting individually, jointly and severally.

## COMMON ALLEGATIONS OF FACT

12.   Defendants are providers of alcohol monitoring services and devices to state and federal law enforcement agencies, courts, as well as various private entities.

13.   The alcohol monitoring device used by Defendants is called the SCRAM Continuous Alcohol Monitoring system (the "SCRAM Device").

14.   The SCRAM Device is approximately the size of a deck of cards and is placed on the wearer's ankle using a strap. The Scram Device is a transdermal monitoring device that was designed to detect and record any instances when the wearer had consumed alcohol by detecting alcohol vapors caused by ingested alcohol diffusing through the skin.

15.   The majority of Defendants' business consists of providing alcohol monitoring services to individuals as part of court mandated rehabilitation programs, as a condition of probation or bond, or other purposes related to the criminal justice system.

PLAINTIFFS' COMPLAINT FOR DAMAGES

16.     While Defendants are selected by state and federal agencies and courts to provide monitoring services for criminal defendants and other individuals who become involved in the criminal justice system, it is such individuals who are ultimately Defendants' customers and choose to purchase Defendants' alcohol monitoring service as an alternative form of monitoring offered by the state or federal agency or court. Defendants enter into private contracts with each such individual to provide them their alcohol monitoring services, and directly charge them a monthly fee.

17.     Defendants advertise their SCRAM Device as a cost-effective and accurate alternative for law enforcement agencies and courts to track the alcohol usage of at-risk individuals such as those charged with driving under the influence or other crimes relating to consumption of alcohol.

18.     Specifically, the SCRAM Device is meant to be worn 24/7. The wearer is instructed to once a day, connect the SCRAM Device to a special docking station connected to the internet to upload the monitoring data collected by the device throughout the day. Once the device is connected, the data is sent to a central data center in Colorado operated by AMS. There, the data is reviewed to determine if any monitoring "event" occurred that indicates that the wearer ingested alcohol.

19.     Unlike blood alcohol monitoring that directly detects the level of alcohol present in the blood stream, Defendants' SCRAM Device relies on transdermal alcohol monitoring, which operates by detecting the amount of alcohol that evaporates through the skin. Because the rate at which alcohol evaporates through the skin is significantly different than the rate at which alcohol is metabolized and detected in the blood stream, transdermal alcohol monitoring requires the use of an algorithm to approximate the blood alcohol content of the wearer based on the amount of alcohol vapor detected at the skin surface.

20      Because transdermal alcohol monitoring measures the amount of

PLAINTIFFS' COMPLAINT FOR DAMAGES

1  alcohol evaporating through the wearers' skin, the SCRAM Device is by its design
2  susceptible to detecting "false-positive" alcohol readings as a result of what
3  Defendants term to be "environmental alcohol." That is, alcohol vapors that
4  wearer's encounter on an everyday basis that may come in contact with the
5  SCRAM Device.

6      21.    Environmental alcohols take many forms, and many everyday
7  products contain alcohol that evaporates upon exposure to air and can trigger a
8  SCRAM Device to detect alcohol vapors. For example, body spray, cologne,
9  aftershave, hand sanitizer; household cleaners such as Windex, gasoline, and many
10  other products that most individuals come across on a day-to-day basis contain
11  alcohol that evaporates into the atmosphere.

12      22.    Given the placement of the SCRAM Device against the wearer's skin
13  on their or her ankle, and the fact that the SCRAM Device is designed to detect the
14  presence of alcohol in the air surrounding the wearer, any environmental alcohol
15  present near or around the device will lead to the device detecting the presence of
16  alcohol vapors even if the wearer had not ingested any alcohol themselves.

17      23.    Defendants advertise to the public and the governmental agencies
18  with whom they seek to work with, that the SCRAM Device is capable of
19  determining the difference between alcohol vapors that are detected as a result of
20  "ingested alcohol" and alcohol vapors that are detected as a result of
21  "environmental alcohol."

22      24.    Further, the individuals who ultimately purchase Defendants' alcohol
23  monitoring services, are not in any way informed that the SCRAM Device could
24  even register any false-positive test results due to environmental alcohol before
25  making the decision to purchase Defendants' alcohol monitoring service and
26  submit to monitoring via the SCRAM Device.

27      25.    However, Defendants misrepresent the risk of false-positive test
28  results as a result of environmental alcohol. In fact, numerous sources have

documented instances of false-positive test results recorded by the SCRAM Device when the wearer was proven to have not consumed any alcohol.

26.    For example, in one instance a criminal defendant in Oakland County Michigan was fitted with the SCRAM Device as a condition of being released on bond following a car accident. Subsequently, the court was notified of three drinking episodes that were potential violations of the conditions of the bond, and a bond revocation hearing was held. However, at the hearing, the Honorable Dennis Powers of the Novi District Court determined that the SCRAM Device was in fact unreliable and that the events detected were false-positives. Specifically, according to the data recorded by the SCRAM Device, during the first drinking episode the wearer consumed alcohol for 63 consecutive hours and maintained an identical blood-alcohol level at all times—a biological impossibility. The second drinking episode was detected by the SCRAM Device at the exact same time as when the wearer was taking a breath-alcohol test that showed no presence of alcohol whatsoever. The third drinking episode was detected when the wearer was in the hospital, and even though the wearer had not consumed any alcohol whatsoever, the data recorded was identical to data corresponding to some who had internally ingested alcohol. The court rejected the evidence presented by AMS and in particular noted that "the SCRAM tether did not meet the requisite standards of 'reliability' or 'general acceptance' in the relevant scientific community" and that "[t]he body of evidence supplied by the defendant made it clear that the readings by the SCRAM tether were not necessarily the result of prolonged drinking episodes."

27.    As another example, another criminal defendant was ordered by the Court in Ramsey County Minnesota to wear the SCRAM ankle bracelet as a result of a DUI related offense. The SCRAM device is worn as an ankle bracelet which monitors the migration of alcohol through the offender's skin. The measurements

are then obtained are converted to a blood-alcohol content which is designated as the TAC, which means Transdermal Alcohol Content.

28.    In this case, on November 9, 2006, the defendants SCRAM device showed a positive reading for alcohol with a confirmed peak reading .035 TAC. On November 10, 2006, at approximately 6:00 a.m., the defendants SCRAM device showed a positive reading for alcohol with an alleged confirmed peak reading in at .05 TAC. The defendant was notified a week later that he tested positive for alcohol consumption and that a probation violation report would be filed against him. The defendant was notified by their attorney and the defendant got an alcohol test done through a certified medical lab and the results were negative.

29.    In the very case, just as the same facts as each of the Plaintiff's, the Honorable Edward S. Wilson found SCRAM highly unreliable and based on the hearing that was held, the trial Court found that SCRAM was not widely accepted in the scientific community. Further, Judge Edward Wilson also determined that the SCRAM device that the defendant was wearing was not in proper working order on the dates in question. As such, the violation was dismissed.

30.    In a study of the accuracy of transdermal alcohol monitoring utilizing the SCRAM Device, it was similarly noted that the "methodology used by AMS cannot separate ethanol from other contaminating alcohols and therefore is not a reliable method." This is of particular significance because ingested alcohol is specifically comprised of ethanol. Thus, any device intended to measure an individual's blood alcohol content that is not specific to ethanol will detect all types of alcohols, including those that are not ingested by an individual. The SCRAM Device utilizes "fuel cell" technology that creates an electric current when an electrolyte contained within the device comes in contact with chemicals that has a "hydroxyl" group. The chemicals include isopropyl alcohol (rubbing alcohol), antifreeze, and many other "alcohols" such as those previously described

1    above. Because the SCRAM device is not specific to detecting ethanol, any

2    number of other alcohols that are not ingested by the wearer can result in the

3    Device registering an "alcohol" reading if they come in contact with the device.

4        31.    Because the SCRAM Device does not directly measure the wearers'

5    blood alcohol content, and is not specific to detecting ethanol, a reading by the

6    SCRAM Device detecting the presence of alcohol vapors is not by itself in any

7    way indicative that the wearer had actually consumed alcohol.

8        32.    As discussed above, Defendants have to apply an algorithm to

9    determine whether any readings collected by the SCRAM Device actually

10   correspond to what Defendants term a "confirmed alcohol consumption event."

11       33.    Specifically, Defendants measure the rate at which the alcohol vapor

12   readings detected by the SCRAM Device increase and decrease in order in order to

13   determine whether they match the predicted rate at which alcohol vapors are

14   released as a result of alcohol being metabolized by the human body. In applying

15   their algorithm to determine whether an "alcohol consumption event" occurred,

16   Defendants rely on a general assumption that the rate at which alcohol vapor is

17   released through the skin following the consumption of alcohol falls within a

18   certain range for all individuals, regardless of any distinguishing physiological

19   characteristics (i.e. weight, height, thickness of skin).

20       34.    Applying this algorithm, Defendants claim to be able to distinguish

21   between alcohol vapor readings caused by "alcohol consumption events" and

22   readings caused by "environmental alcohols," because alcohol vapor readings that

23   are caused by environmental alcohols are supposed to have a significantly different

24   rate at which they increase/decrease in comparison to readings that are caused by

25   ingestion of alcohol.

26       35.    Because the raw data produced by the SCRAM Device is by itself of

27   limited use in determining whether the wearer actually consumed alcohol, the data

28   has to be sent to AMS' central monitoring facility in Colorado to be analyzed and

PLAINTIFFS' COMPLAINT FOR DAMAGES

1  for AMS' personnel to apply the algorithm and attempt to determine whether an

2  "alcohol consumption event" had occurred.

3      36.    When a customer of Defendants' alcohol monitoring service connects

4  their SCRAM Bracelet into the internet connected docking station each day, the

5  data collected for that day is sent to AMS for such analysis.

6      37.    If upon analyzing the data AMS determines that the alcohol vapor

7  readings were caused by an "alcohol consumption event," Defendants inform the

8  law enforcement agency or court exercising jurisdiction over the wearer that based

9  on their analysis of the collected data the individual had consumed alcohol.

10      38.    However, the individual who was actually wearing the SCRAM

11  Device, is not in any way informed by Defendants or by the device itself that an

12  "alcohol consumption event" had occurred, neither at the time when the SCRAM

13  Device is actually recording the alcohol vapor readings, nor when AMS concludes

14  its analysis of the data and informs the law enforcement agency or the court.

15      39.    In fact, the SCRAM Device is not designed to, and does not actively

16  inform the wearer in real-time when it is detecting alcohol vapors. Even if the

17  SCRAM Device records alcohol vapor readings continuously for 24 hours, when

18  the wearer connects the SCRAM Device to the docking station to upload the data,

19  the SCRAM Device will simply flash a green light to inform the wearer that the

20  upload was successful.

21      40.    Because the vast majority of Defendants' customers purchase the

22  transdermal alcohol monitoring service as part of a condition of their bond or

23  probation, a report to a law enforcement agency or judiciary that an individual has

24  been determined to have consumed alcohol will often be considered a violation of

25  the conditions of any such bond or probation and trigger a hearing revoking the

26  bond/probation.

27

28      41.    However, because Defendants' customers are not timely notified

PLAINTIFFS' COMPLAINT FOR DAMAGES

1   when the SCRAM Device detects the presence of alcohol vapors, when the data is

2   uploaded daily to AMS, or even when AMS sends a report stating that an "alcohol

3   consumption event" has occurred, they often do not discovery that they had

4   supposedly violated the conditions of their bond or probation until several days

5   after the "alcohol consumption event" had occurred.

6       42.    Thus, Defendants' customers who wish to dispute any finding that

7   they violated the terms of their bond/probation are unable to obtain evidence that

8   could allow them to challenge the revocation of their bond/probation because by

9   the time they are made aware of the potential violation, due to the rate of alcohol

10  metabolism in the human body, Defendants' customers cannot obtain a timely

11  blood or breath alcohol test that could definitively show that they did not consume

12  alcohol at the time indicated by the SCRAM Device.

13                          **SCRAM and AMS Device**

14      43.    Alcohol Monitoring Systems, Inc., was found in 1997 and began

15  manufacturing, marketing, and selling SCRAM Devices. According to its website,

16  AMS and SCRAM has a presence in all 50 states and Canada.

17      44.    Currently, SCRAM and AMS produces several different models of the

18  SCRAM Device, as well as other products such as the traditional home GPS ankle

19  monitor as well as a drug patch that an offender can wear similar to the SCRAM

20  ankle monitor. The devices by SCRAM and AMS are portable and employ the

21  same fuel cell technology to determine the amount of alcohol in a user's sweat

22  level. Both SCRAM and AMS also lease and sells their devices to third party

23  companies all over the world.

24                  *Scram and AMS's False Claims of Reliability*

25      45.    In SCRAM and AMS's marketing materials, and on both of their

26  websites, to government agencies such as the Courts, and law enforcement

27  agencies, and their customers, SCRAM and AMS advertises their products as

28  being reliable and can make a factual determination whether or not if the SCRAM

1  customer has consumed alcohol, or applied environmental products such as lotion,

2  or hand sanitizer that contains alcohol ingredients.

3    46.    However, this is entirely false and misleading and SCRAM and AMS

4  made these statements despite the fact that statements are not true. The SCRAM

5  Device itself is not specific enough to test for ethanol which is an alcohol

6  ingredient. The term "alcohol" has been synonymous with "spirituous" liquids for

7  the past 300 years. There are four types of alcohol: methyl alcohol, ethyl alcohol,

8  propyl alcohol and butyl alcohol. Ethyl Alcohol, or ethanol ($C_2H_5OH$), is the type

9  used in the production of alcoholic beverages. The other three types, methyl,

10  propyl and butyl alcohol, if consumed can result in blindness and death, even in

11  relatively small doses. Alcohol, or ethanol, is the intoxicating agent found in beer,

12  wine and liquor. The SCRAM Device again is not as reliable as the Defendants

13  advertised.

14    47.    Contrary to SCRAM and AMS's marketing representations, the

15  SCRAM Devices does not have any of the claimed certifications and validations.

16  Thereby, the SCRAM Device is more prone to creating false positive consumption

17  and tamper reports.

18    48.    More specifically, the SCRAM Devices have been deemed unreliable

19  as evidence of intoxication, particularly because the SCRAM Devices results have

20  not been supported by scientific evidence or testimony. However, the Defendants

21  make misrepresentations to their customers as well as government agencies that the

22  SCRAM Device has in fact been accepted into the scientific community when it

23  fact it has not been. The Defendants made these statements to their customers and

24  government agencies knowing the falsity of these statements anyways in an effort

25  to bolster their money-making scheme.

26    49.    Both SCRAM and AMS, continues to fail, to inform their consumers,

27  including Plaintiffs and customers, that its SCRAM Devices are (a) the SCRAM

28  device has never been accepted into the scientific community, (b) the SCRAM

1  Device inadmissible in court as evidence of intoxication, and deemed unreliable by

2  courts, (c) the SCRAM Device is capable of producing false readings due to the

3  fact the SCRAM Device is not specific enough to test for the ingredients of

4  ethanol, and (d) when the SCRAM customers uploads their readings through the

5  internet, a bad internet connection can cause a false positive.

6      50.    Despite these representations, the SCRAM Devices do not function as

7  the Defendants describes, as they constantly display error messages, fail to record

8  and transmit data to the internet, and return false positive test results. The SCRAM

9  Devices fail to reliably perform their intended purpose because users frequently

10  and repeatedly receive error messages on their SCRAM Device informing them

11  that their test has not been sent and instructing them to try again. Instead of quickly

12  and conveniently submitting a valid test, users are forced to continue attempting to

13  submit a successful test in order to remain compliant in their monitoring program.

14      51.    Despite SCRAM and AMS assurances, the SCRAM Devices do not

15  reliably upload data to the internet. Missed test may result in serious consequences,

16  including revocation of their probation and jail time. According to SCRAM, "If a

17  client either has a positive test or a missed test, both should be viewed as a positive

18  test and treated equally."

19      52.    Both SCRAM and AMS failed, and continues to fail, to inform

20  consumers, including Plaintiff that its SCRAM Devices do not allow users to

21  establish their sobriety at any time because the SCRAM Devices (a) frequently and

22  repeatedly display error messages, (b) require users to make repeated attempts to

23  submit a successful test, (c) frequently fail to transmit test results to the internet,

24  (d) erroneously report that users missed scheduled tests, and (e) erroneously

25  generate false positive test results.

26      53.    Consumers, including the Plaintiff previously and currently purchased

27  or rented SCRAM Devices because they believed the SCRAM Devices were

28  verified and certified alcohol screening devices, and that SCRAM Devices allowed

users to establish their sobriety at any time. Consumers, including the Plaintiff and believed the SCRAM Devices have these qualifications and characteristics in reliance and based on SCRAM and AMS's misrepresentations and omissions described herein.

54.     Plaintiff relied on SCRAM and AMS's foregoing misrepresentations and omissions in deciding to purchase or rent the said SCRAM Devices. Had Plaintiff known the truth about SCRAM and AMS's aforementioned misleading representations, they would not have purchased or rented the SCRAM Devices, as there were and are alternative alcohol testing technologies available to them that they could and would have chosen.

55.     Throughout the course of the monitoring programs, Plaintiffs' SCRAM Devices repeatedly displayed error codes, failed to upload test results, erroneously reported missed tests, and returned false positive and tamper test results.

56.     As a result of SCRAM and AMS's misrepresentations and omissions, as well as the SCRAM Devices' functionality issues, Plaintiff have also incurred financial damages resulting from the purchase or rental of SCRAM Devices.

57.     Plaintiff has been injured due to SCRAM and AMS's deception in marketing its SCRAM Devices, and as a result of SCRAM and AMS's despicable conduct, Plaintiff has suffered financial damages resulting from the purchase or rental of the Defendants SCRAM Devices.

## FACTS SPECIFIC TO PLAINTIFF

58.     On the evening of February 27, 2016, Plaintiff was driving to Camp Pendleton in San Diego California when he was pulled over by a California Highway Patrol officer. The officer suspected that Plaintiff had been drinking and performed a preliminary alcohol-screening test using a handheld Breathalyzer device. The officer then placed Plaintiff under arrest for driving while under the influence.

59.     Soon after he was arrested, Plaintiff was brought to a San Diego Sheriff's police station, where he was administered another, more extensive Breathalyzer test. While unknown to him at the time, Plaintiff's blood alcohol content was recorded as being under the legal limit.

60.     Plaintiff was thereafter released, and a hearing date was set for his arraignment on the driving under the influence charge was set for April 14, 2016, at approximately 10:00 am.

61.     On April 14, 2016, Plaintiff pleaded not guilty to the driving under the influence charge. Plaintiff was given the choice of being released on bond pending further adjudication of the charges on the additional condition that he be monitored by Defendants and wear the SCRAM Device. At the time of the hearing Plaintiff was not in any way informed that the SCRAM Device is capable of detecting environmental alcohols, that there was a possibility it could detect false-positives, or that the SCRAM Device would not actually inform Plaintiff himself that it had detected alcohol vapors, before Plaintiff agreed to the conditions of the bond and to purchase Defendants' monitoring services.

62.     Upon conclusion of the hearing Plaintiff was taken to the nearby jail where he was searched, relieved of his belongings, and put into a jail cell to wait for a SCRAM of California employee to arrive and attach the SCRAM Device to his ankle. Even though Plaintiff had posted his bail amount by 5:00 pm that day, April 14, Plaintiff was nonetheless detained for over 12 additional hours to wait for a SCRAM of California employee to arrive.

63.     The SCRAM of California employee eventually arrived on the morning of April 15, 2016. Even though the employee did not work for any state agency, court, or in law enforcement, the employee had a key to the jail cell where Plaintiff was being detained.

64.     The SCRAM of California employee entered Plaintiff's cell so that she could fulfill the conditions of Plaintiff's bond and place the SCRAM Device on

PLAINTIFFS' COMPLAINT FOR DAMAGES

1   his left ankle, but was unable to get the SCRAM Device secured without additional

2   equipment. To get the device placed on Plaintiff, the employee "signed" Plaintiff

3   out of the jail facility so that she could escort him to her nearby office where she

4   would be able to place the SCRAM Device on Plaintiff. The employee was

5   officially given custody over Plaintiff and all of his personal belongings that were

6   taken from him before he was placed in jail.

7       65.    Upon taking custody of Plaintiff, the SCRAM of California employee

8   escorted him to her office, where she was able to fasten a SCRAM Device to his

9   left ankle.

10      66.    After Plaintiff had the SCRAM Device placed on his ankle, the

11  SCRAM of California employee had Plaintiff fill out a "Client Intake Form" and

12  asked him to provide his signature on a credit card sales receipt for a $325.00

13  payment which she stated was the initiation fee for Defendants' monitoring

14  service. When Plaintiff inquired how the employee had already obtained payment

15  for the initiation fee, the employee stated that she took Plaintiff's credit card from

16  his wallet that was given to her along with Plaintiff's other belongings when she

17  was given custody of him. Plaintiff never provided his credit card to the employee,

18  never authorized the employee to charge that particular credit card, and was

19  generally unaware that the employee had permission to search his personal

20  belongings to find and apply any form of payment.

21      67.    Plaintiff was then led to another room where he, along with several

22  other individuals who had similarly purchased Defendants' monitoring services,

23  saw a short two to three-minute orientation video regarding the SCRAM Device

24  and general information related to maintaining the SCRAM Device and avoiding

25  any damage to it. After the video the SCRAM of California employee had a brief

26  follow-up presentation addressing the video and then talked at length about the

27  payment instructions and Plaintiff's, and the other said individuals' financial

28  obligations related to the monitoring service and the SCRAM Device. After the

PLAINTIFFS' COMPLAINT FOR DAMAGES

1  SCRAM of California employee finished her presentation Plaintiff was released

2  from custody.

3      68.    At no time was Plaintiff provided any literature, pamphlet, brochure,

4  or any other form of documentation regarding the SCRAM Device and the

5  Defendants' transdermal monitoring service.

6      69.    Plaintiff was also never informed either through the video or by the

7  SCRAM of California employee that the SCRAM Device can potentially detect

8  false-positive alcohol readings. In fact, the SCRAM of California employee

9  actually reassured Plaintiff and the other individuals present that the SCRAM

10 Device can distinguish between alcohol vapor readings caused by ingested alcohol,

11 and those caused by environmental alcohols.

12     70.    The following week, on April 20, 2016, at approximately 6:00 pm,

13 Plaintiff visited a Burlington Coat Factory store in Murrieta California with a

14 family relative.

15     71.    While at the Burlington store, Plaintiff shopped for, among other

16 items, a body spray or cologne. After trying on one of the body sprays in the store,

17 Plaintiff purchased it for future use.

18     72.    That evening Plaintiff returned to the hotel where he was staying in

19 Lake Elsinore, California at approximately 8:00 pm. Plaintiff had plans to meet

20 with a friend in the evening for dinner in Riverside, California, and upon returning

21 to his hotel room Plaintiff took a shower and then put on the body spray that he had

22 purchased that same day before heading out.

23     73.    However, at approximately 9:00 pm, before Plaintiff had left his hotel

24 room, he was informed that his friend was no longer available and canceled their

25 plans for the evening. Plaintiff decided to stay in for the evening in his hotel room,

26 and went to sleep shortly thereafter.

27

28     74.    Complying with the requirement imposed by Defendants that he

connect his SCRAM Device to the internet once a day to upload the monitoring data collected, before going to sleep, at approximately 9:00 pm on April 20, 2016, Plaintiff connected his SCRAM Device to the internet connected docking station that he was provided. The docking station flashed a green light to indicate that the upload was successful, but otherwise did not provide any other information to Plaintiff regarding the data uploaded.

75.     Sometime in the afternoon on April 21, 2016, Plaintiff then again connected his SCRAM Device to the docking station, which again flashed a green light to indicate that the upload was successful.

76.     More than a week later, on or about April 29, 2016, Plaintiff received a follow up phone call from the same SCRAM of California employee who had originally placed the SCRAM Device on him and charged him the initiation fee. The employee sought to verify Plaintiff's payment information and that he would make the bi-weekly $225.00 payment that was coming due. More importantly, during this phone call the employee also informed Plaintiff, for the first time that he had violated the conditions of his bond because his SCRAM Device had detected alcohol vapors that were determined by AMS to have been caused by the consumption of alcohol.

77.     Upon learning this information, Plaintiff immediately investigated further and discovered that, much to his shock and surprise, on the evening of April 20, and into the morning hours of April 21, the SCRAM Device he was wearing had detected alcohol vapors.

78.     Plaintiff also discovered that on April 25, 2016, Defendants sent a report directly to the court where his driving under the influence charge was being adjudicated informing it that Defendants had analyzed the data collected from Plaintiff's SCRAM Device and determined that there was a "confirmed alcohol consumption event" that occurred between April 20, 2016 and April 21, 2016.

79.     Particularly disturbing to Plaintiff was the fact that at no point

1   between April 20, 2016 and April 21, 2016 was Plaintiff ever informed that the

2   SCRAM Device had detected alcohol vapors, that Defendants had determined that

3   an "alcohol consumption event" took place, or even that Defendants had reported

4   to the court that he had violated the conditions of his bond.

5        80.    Even though Plaintiff did not consume any alcohol at any time on

6   April 20 or April 21, by the time Plaintiff was made aware of Defendants' report

7   on April 29, it was well past the narrow 12-hour window for him to have a blood

8   alcohol test performed to conclusively prove that he did not consume any alcohol,

9   or to even obtain a urine alcohol screening that shows whether an individual had

10  consumed alcohol in the past 80 hours. Following several numerous failed

11  communications with SCRAM of California regarding how he did not consume

12  any alcohol between April 20 and April 21, and that the recorded readings must

13  have been the result of an erroneous false positive, on May 18, 2016 Plaintiff filed

14  a lawsuit against Defendants in the Southern District of California alleging various

15  claims in relation to the transdermal alcohol monitoring service he had purchased

16  from Defendants and the false-positive alcohol vapor readings that Defendants'

17  SCRAM Device detected and which Defendants reported to the court.

18       81.    Shortly after Plaintiff filed his federal lawsuit, the same SCRAM of

19  California employee who had originally placed the SCRAM Device on Plaintiff,

20  contacted Plaintiff and instructed him to take off the SCRAM Device. Soon

21  thereafter Defendants reported to the court where Plaintiff's case was pending that

22  they would discontinue monitoring Plaintiff.

23       82.    The transdermal alcohol monitoring report that was sent to the court

24  by Defendants without Plaintiff's knowledge showed that the supposed "alcohol

25  consumption event" occurred approximately between 9:00 pm on April 20, and

26  12:00 pm on April 21, with the "peak" alcohol vapor readings being recorded at

27  midnight on April 21.

28       83.    The alcohol vapor readings recorded by the SCRAM Device worn by

1   Plaintiff that supposedly evidenced Plaintiff consuming alcohol, directly coincided

2   with Plaintiff's use of the body spray that he had purchased earlier that day on

3   April 20, and had put on himself shortly before getting into bed to go to sleep at

4   approximately 9:00 pm.

5        84.    Because Plaintiff slept under a cover that night, the alcohol

6   evaporating from the body spray that he had put on could not dissipate into the air

7   and instead over time gradually increased in concentration under the cover.

8   Because the SCRAM Device is not specific to detecting ethanol that is contained in

9   drinking alcohol, and detects all alcohol vapors regardless of their source, the

10  gradual buildup of the alcohol vapors released from the body spray Plaintiff had

11  put on was detected, and Defendants' "algorithm" determined that the readings

12  constituted an "alcohol monitoring event" simply based on the fact that there was a

13  gradual rise and fall in the concentration of alcohol vapors detected by the SCRAM

14  Device under the cover.

15       85.    Even though Plaintiff was unable to obtain a timely blood alcohol or

16  urine screening test, Plaintiff later discovered that there was another alternative

17  form of testing that could prove that he did not in fact consume alcohol on April 20

18  and April 21. On June 2, 2016, Plaintiff visited a certified medical laboratory and

19  had a hair follicle test performed that looked for any traces of the by-products of

20  alcohol metabolism from the prior 90 days.

21       86.    Because hair follicles are repositories of certain chemicals that are

22  created when the body ingests drugs or alcohol, and because of the nature of how

23  long hair follicles remain in the scalp, a hair follicle test can be used to determine

24  whether an individual has consumed alcohol or drugs for a much more extended

25  period of time than a blood or urine screening test.

26       **87.    The results of Plaintiff's hair follicle test came back negative for**

27  **the presence of ethyl glucuronide, indicating that Plaintiff had not consumed**

28  **alcohol on April 20 or April 21.**

88.     Plaintiff paid a total of $850.00 to Scram of California for Defendants' alcohol monitoring service.

89.     Plaintiff paid a total of $600.00 for a certified hair follicle test from a certified laboratory.

90.     Had Plaintiff known that the SCRAM Device registered false positive test results, did not timely inform the user when the device was detecting the presence of alcohol vapors, was unable to distinguish between environmental alcohols and ingested alcohol, and that Defendants would not timely inform Plaintiff once they had determined that an alcohol monitoring event occurred, Plaintiff would have never agreed to purchase Defendants' alcohol monitoring service as a condition of his bond, and would have petitioned the court for an alternative means of monitoring.

## PLAINTIFF'S FIRST CAUSE OF ACTION

**(Unfair, Unlawful, Deceptive Trade Practices, Bus. Prof. Code § 17200, et.seq)**

**Plaintiff  v. AMS and SCRAM**

91.     Plaintiff re-alleges and incorporates by reference the paragraphs of this Complaint as if set forth herein.

92.     Within four (4) years preceding the filing of this Complaint, and at all times mentioned herein, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices in California by engaging in the unfair, deceptive and unlawful business practices outlined in this Complaint. In particular, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices by, without limitation, the following:

a.     deceptively representing to Plaintiff, that their products are reliable and can make a determination if alcohol in present in the wearers system, as opposed to the wearer trying on environmental products that contain alcohol;

c.     failing to adequately inform Plaintiff that the wearer should not use

1    environmental products;

2        d.      failing to adequately inform Plaintiff, that the Products were not and

3    did not exclusively made by Scram;

4        e.      failing to adequately inform Plaintiff, that the Scram device had never

5    been accepted into the scientific community;

6        f.      failing to inform Plaintiff that the monthly payment can be lowered

7    based on the wearers income;

8        93.     Plaintiff relied to their detriment on Defendants' unfair, deceptive and

9    unlawful business practices. Had Plaintiff been adequately informed and not

10   deceived by Defendants, they would have acted differently by not purchasing (or

11   paying less for) the Defendants' Products.

12       94.     Defendants' acts and omissions are likely to deceive the general

13   public.

14       95.     Defendants engaged in these unfair practices to increase their profits.

15   Accordingly, Defendants have engaged in unlawful trade practices, as defined and

16   prohibited by section 17200, *et. seq.* of the California Business and Professions

17   Code.

18       96.     The aforementioned practices, which Defendants have used to their

19   significant financial gain, also constitute unlawful competition and provide an

20   unlawful advantage over Defendants' competitors as well as injury to the general

21   public.

22       97.     Plaintiff seeks full restitution of monies, as necessary and according to

23   proof, to restore any and all monies acquired by Defendants from Plaintiff by

24   means of the unfair and/or deceptive trade practices complained of herein, plus

25   interest thereon.

26       98.     Plaintiff seeks an injunction to prohibit Defendants from continuing to

27   engage in the unfair trade practices complained of herein.

28       99.     The acts complained of herein occurred, at least in part, within four

1   (4) years preceding the filing of this Complaint.

2       100.   Plaintiff is entitled to and do seek both a declaration that the above-

3   described trade practices are unfair, unlawful and/or fraudulent, and injunctive

4   relief restraining Defendants from engaging in any of such deceptive, unfair and/or

5   unlawful trade practices in the future. Such misconduct by Defendants, unless and

6   until enjoined and restrained by order of this Court, will continue to cause injury in

7   fact to the general public and the loss of money and property in that Defendants

8   will continue to violate the laws of California, unless specifically ordered to

9   comply with the same. This expectation of future violations will require current

10   and future customers to repeatedly and continuously seek legal redress in order to

11   recover monies paid to Defendants to which Defendants are not entitled for

12   services not completely rendered.

13       101.   As a direct and proximate result of such actions, Plaintiff has suffered

14   and continue to suffer injury in fact and have lost money and/or property as a result

15   of such deceptive, unfair and/or unlawful trade practices and unfair competition in

16   an amount which will be proven at trial, but which is in excess of the jurisdictional

17   minimum of this Court. Among other things, Plaintiff lost the amount they paid for

18   the Defendants Defective Products.

19       102.   As a direct and proximate result of such actions, Defendants have

20   enjoyed, and continue to enjoy, significant financial gain in an amount which will

21   be proven at trial, but which is in excess of the jurisdictional minimum of this

22   Court.

23   **PLAINTIFF'S SECOND CAUSE OF ACTION**

24   **(False Advertising, Bus. Prof. Code § 17500, et. seq. ("FAL")**

25   **Plaintiff v. AMS and SCRAM**

26       103.   Plaintiff re-alleges and incorporates by reference the paragraphs of

27   this Complaint as if set forth herein.

28       104.   Beginning at an exact date unknown to Plaintiff, but within three (3)

1  years preceding the filing of this Complaint, the Defendants made untrue, false,

2  deceptive and/or misleading statements in connection with the advertising and

3  marketing of their Products.

4      105.   Defendants made representations and statements (by omission and

5  commission) that led reasonable customers to believe that they were purchasing a

6  product so unique, that it would be proven scientifically that the wearer has, or did

7  at some point consume alcohol. At all times relevant, Defendants' knew that their

8  representations were false, but made them anyways.

9      106.   Plaintiff relied to their detriment on Defendants' false, misleading and

10  deceptive advertising and marketing practices, including each of the said stated

11  misrepresentations and omissions set forth in each of the paragraphs herein. Had

12  Plaintiff been adequately informed and not intentionally deceived by Defendants,

13  they would have acted differently by, without limitation, refraining from

14  purchasing Defendants' Products, paying less for them or purchasing smaller

15  quantities.

16      107.   Defendants' acts and omissions are likely to deceive the general

17  public.

18      108.   Each of the said Defendants engaged in these false, misleading and

19  deceptive advertising and marketing practices to increase their profits.

20      109.   Accordingly, Defendants have engaged in false advertising, as defined

21  and prohibited by section 17500, *et. seq.*, of the California Business and

22  Professions Code.

23      110.   The aforementioned practices, which Defendants used, and continue

24  to use, to their significant financial gain, also constitute unlawful competition and

25  provide an unlawful advantage over Defendants' competitors as well as injury to

26  the general public.

27

28      111.   Plaintiff seeks full restitution of monies, as necessary and according to

1  proof, to restore any and all monies acquired by Defendants from Plaintiff, the

2  general public, or those similarly situated by means of the false, misleading and

3  deceptive advertising and marketing practices complained of herein, plus interest

4  thereon.

5      112.   Plaintiff seeks an injunction to prohibit Defendants from continuing to

6  engage in the false, misleading and deceptive advertising and marketing practices

7  complained of herein. The acts complained of herein occurred, at least in part,

8  within three (4) years preceding the filing of this Complaint.

9      113.   Plaintiff and those similarly situated are further entitled to and do seek

10  both a declaration that the above-described practices constitute false, misleading

11  and deceptive advertising, and injunctive relief restraining the Defendants from

12  engaging in any such advertising and marketing practices in the future. Such

13  misconduct by Defendants, unless and until enjoined and restrained by order of this

14  Court, will continue to cause injury in fact to Plaintiff and the general public and

15  the loss of money and property in that the Defendants will continue to violate the

16  laws of California, unless specifically ordered to comply with the same. This

17  expectation of future violations will require current and future customers to

18  repeatedly and continuously seek legal redress in order to recover monies paid to

19  Defendants to which Defendants are not entitled. As a direct and proximate result

20  of such actions, Plaintiff suffered, and continues to suffer, injury in fact and have

21  lost money and/or property as a result of such false, deceptive and misleading

22  advertising in an amount which will be proven at trial.

23

24

25

26

27

28                          **PRAYER FOR RELIEF**

PLAINTIFFS' COMPLAINT FOR DAMAGES

1    WHEREFORE, Plaintiffs Anthony Oliver prays for judgment as follows:

2        1.    For general and special damages in an amount according to proof;

3        2.    For punitive damages in an amount sufficient to punish Defendants

4    and deter them from engaging in similar conduct in the future pursuant to Code of

5    Civil Procedure § 3294;

6        3.    For restitution of all improper fees collected by the Defendants from

7    Plaintiff;

8        4.    An order from this Court Enjoining Defendants and each of them for

9    their ruthless conduct;

10       5.    For costs of suit pursuant to Fed.R.Civ.P. 54(d), 28 U.S.C. § 1920 and

11   Cal.Civ. Code § 1032;

12       6.    Such other and further relief as this Court deems just and proper.

13

14   Dated:        June 23, 2017          By: _____

15                                        Anthony Oliver, Plaintiff Pro Se

16

17                        **JURY TRIAL DEMANDED**

18       Pursuant to the Seventh Amendment to the United States Constitution,

19   Plaintiff is entitled to, and demands a trial by jury.

20

21
                                          By: _____
22   Dated:        June 23, 2017

23                                        Anthony Oliver, Plaintiff Pro Se

24

25

26

27

28

-27-

PLAINTIFFS' COMPLAINT FOR DAMAGES

PRIORITY MAIL
POSTAGE REQUIRED

PRES.

UNITED STATES
POSTAL SERVICE.

Retail

PRESS FIRMLY TO SEAL

P **P**

US POSTAGE PAID
**$6.65**

★ Origin: 31322
0 Lb 14.80 Oz
Jun 20, 17
1269960782-7                    1006

**PRIORITY MAIL ® 2-Day**

$   Expected Delivery Day: 06/22/2017

**USPS TRACKING NUMBER**



9505 5100 0612 7171 1776 05

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.

FROM:

Anthony Oliver, Plaintiff
7306 Georgia Highway 21
Suite #101 - Box #187
Port Wentworth, Georgia 31407


CV

TO:

United States District Court - Central Dist. CA
Attn: Civil Clerks filing
312 N. Spring St. # G-8
Los Angeles, California 92101
                                        90012

RECEIVED
CLERK, U.S. DISTRICT COURT

JUN 26 2017

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY



PS00001000014

EP14F July 2013
OD: 12.5 x 9.5

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

UNITED STATES
POSTAL SERVICE.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☒ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| ANTHONY OLIVER, an individual; | Scram of California, Inc. et al., |

| (b) County of Residence of First Listed Plaintiff    Chatham | County of Residence of First Listed Defendant    Los Angeles |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| (c) Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. | Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. |
|---|---|
| Anthony Oliver, Plaintiff Pro Se<br>7306 GA Highway 21, Suite 101 – Box # 187<br>Port Wentworth, Georgia 31407 | Unknown |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multidistrict Litigation - Transfer
☐ 8. Multidistrict Litigation - Direct File

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☐ No   ☒ **MONEY DEMANDED IN COMPLAINT:** $ 4,000,000.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Diversity - 28 USC 1331 and 1332

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 376 Qui Tam (31 USC 3729(a)) | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 400 State Reapportionment | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 835 Patent - Abbreviated New Drug Application |
| ☐ 410 Antitrust | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☒ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 895 Freedom of Info. Act | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 896 Arbitration | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

| FOR OFFICE USE ONLY:   Case Number: | **CV17 -04735** | |
|---|---|---|
| CV-71 (05/17) | CIVIL COVER SHEET | Page 1 of 3 |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII.  VENUE**: Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes  ☒ No | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B:  Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | B.1. Do 50% or more of the defendants who reside in the district reside in Orange Co.? *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes  ☒ No | | ☒ NO. Continue to Question B.2. |
| If "no," skip to Question C. If "yes," answer Question B.1, at right. | B.2. Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☒ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C:  Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | C.1. Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.? *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes  ☒ No | | ☒ NO. Continue to Question C.2. |
| If "no," skip to Question D. If "yes," answer Question C.1, at right. | C.2. Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☒ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D:  Location of plaintiffs and defendants? | A. Orange County | B. Riverside or San Bernardino County | C. Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |

| D.1.  Is there at least one answer in Column A? | D.2.  Is there at least one answer in Column B? |
|---|---|
| ☐ Yes  ☒ No | ☐ Yes  ☒ No |
| If "yes," your case will initially be assigned to the SOUTHERN DIVISION. | If "yes," your case will initially be assigned to the EASTERN DIVISION. |
| Enter "Southern" in response to Question E, below, and continue from there. | Enter "Eastern" in response to Question E, below. |
| If "no," go to question D2 to the right. → | If "no," your case will be assigned to the WESTERN DIVISION. |
| | Enter "Western" in response to Question E, below. ↓ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: → | WESTERN |

| QUESTION F: Northern Counties? | | |
|---|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes | ☒ No |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court**?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court**?

☐ NO  ☐ YES

If yes, list case number(s):  CV-17-01474-CAS-(PLAx) _____

Civil cases are related when they (check all that apply):

☒ A. Arise from the same or a closely related transaction, happening, or event;

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

A civil forfeiture case and a criminal case are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _____  DATE: June 23, 2017 _____

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| ANTHONY OLIVER, an individual; | ) )<br>) )<br>) )<br>*Plaintiff(s)* |
| v. | ) )<br>) ) |
| Scram of California, Inc., a California Corporation; Alcohol Monitoring Systems, Inc., a Delaware Corporation; and DOES 1-10, inclusive. | ) )<br>) )<br>) )<br>) )<br>*Defendant(s)* |

Civil Action No. **CV17 -04735** MWF (SSx)

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Scram of California, Inc.
Agent: Aaron Fleisher
402 W. Broadway, # 1250
San Diego, California 92101

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Anthony Oliver, Plaintiff Pro Se
7306 GA Highway 21, Suite 101 – Box # 187
Port Wentworth, Georgia 31407
(818) 624-2504 (telephone)
(818) 855-1119 (facsimile)

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                        *Server's signature*

                                                        _____
                                                        *Printed name and title*


                                                        _____
                                                        *Server's address*

Additional information regarding attempted service, etc: